Thank you, Your Honors. Good morning. May it please the Court, John Chepaugh on behalf of the City of New York. The First Amendment's purpose in the commercial context is to promote access to information, and that is precisely what this law does. Restaurants are plaintiffs' customers, and plaintiffs' business model is to control the flow of orders to those restaurants. Now, because of plaintiffs' market power and their transformation, really, of the restaurant industry and the restaurant market, that economic relationship is no longer truly voluntary, and so this disclosure remedies some of the imbalance distorting that economic relationship by providing information about the very product of the restaurant industry. I'm sorry, what did you say is no longer voluntary? I'm having a little trouble hearing you. Maybe you could... Certainly. Thank you. Whether these restaurants are going to appear on these platforms or not, because of the plaintiffs' tremendous market power and their capture of the delivery business, side of business for these restaurants, coupled with the tremendous fees that they charge to these restaurants, restaurants need the ability to make the decision for themselves, the autonomy to make the decision for themselves, whether to remain on these platforms, and that's what the Customer Data Law does. It provides them access to their customer base. I would emphasize that, you know, 20 percent of a restaurant's customers drive 80 percent of their business. That's in the record, and so by separating restaurants from their base, restaurants are put in a bind. Well, restaurants still have the opportunity to create their own database and maintain lists of customers who order from them, who come in and partake of their services, don't they? I don't think they do have a real opportunity, Your Honor, because I think that the record shows that plaintiffs have captured most of this segment, that the delivery segment is driven by plaintiffs and these restaurants' appearance on those platforms, and what happens is they get the data and they withhold it from the restaurants themselves, and there's not the equivalent of restaurants having their own ordering platforms and things like that, and fundamentally, even if there were that possibility for them to do so, that would still leave a tremendous amount of customer data in the hands of plaintiffs that is being used against restaurants themselves in a detrimental way to prevent them from competing, not with plaintiffs, but with other restaurants, and so if any of these restaurants decide to leave plaintiffs' platforms, that data is left behind, and it can be used to determine who the best customers are, what their preferences are. That's an interesting argument if you're concerned about... The law applies and makes the information available to a huge chain of restaurants also, doesn't it? So you're talking about the economic inequality, but the law doesn't recognize that. The law's caption is preserving the restaurant industry, but it's not directed at small restaurants. The law allows large restaurants. Chick-fil-A could get this information, could it not? Yeah, I think that's right, so it depends... I don't understand your argument. Your argument says you're trying to level the playing field, and you're talking about requiring the information to be available to multinational corporations also. Well, I think that what's important to remember is that... It doesn't sound like it's tailored to the purpose that you are providing to us. Well, I think that it is tailored, Your Honor, because of the nature of the data here. So this is data that historically has been in the hands of restaurants when there's delivery orders being placed, but now it's being filtered through plaintiffs, and they're placing restrictions on how that data can be used. It can no longer be used by restaurants once they complete the order. So I think that, to Your Honor's point about it also benefiting some larger corporations, that may be true, but I think that it's important to remember the First Amendment's not about protecting a competition or a competitive status. It's about providing... In the commercial context, it's about ensuring the robust and free flow of information. Are there cases, either under Zadar or Central Hudson, where the information being required to be disclosed is sort of competitor information? Well, I think that's... Because this seems different from the types of regulations where generally they're consumer protection-type disclosure requirements, and this seems very different from that. Well, I think that's... A couple of points, Your Honor. I think that... So I would ask this Court to look to its decisions in Bullock as well as Compass Care. I think that those are pretty far removed from this sort of consumer daylighting sorts of analyses. There's no specific transaction identified in those cases. What we're talking about is disclosure of social media, content moderation policies, or anti-discrimination. And Compass Care was the discrimination policies, right? So, I mean, those are very easy to see why a user or a customer or employee would want to know these things, and so the regulation says you have to make these available. Well, I would submit, Your Honor, that the same holds true for restaurants and customer data. So I think that the takeaway from those, in my view, is that that information informed the economic decision-making of the people that are on these social media sites or the people that are employed by Compass Care. And the same holds true here. It informs the economic decision-making of the restaurants as to whether they are going to stay on these platforms, leave these platforms, and not extracting a tremendous price if they do decide to leave these platforms without... But an individual making an informed decision about whether to use a service or to, you know, give their business to a company seems different from... I guess this is maybe Judge Roberts' point, seems different from a restaurant trying to improve its business and make more money. Well, I think that there's two sides of that, Your Honor. I think that part of it is the restaurants being enabled to make this decision, but I think that the core similarity between the thread between all of these is that it enhances the decision-making capacity of the consumer vis-a-vis the counterparty that is being asked to disclose this information. Aren't they, in a way, like competitors for the way in which food is delivered to people who don't want to come on-site? And the platforms do it one way and the restaurants still have the capability of doing it their own. And this is why Safe Flag is of interest, because we struck down a regulation requiring, or attempted to block certain kinds of statements being made online by the Safe Flight Insurance Company. Well, I submit, Your Honor, that competitor status is a bit of a red herring in this case. I think that, you know, Safe Flight wasn't about that. Safe Flight was about... wasn't really a disclosure law at all. It was a speech restriction. What the law in Safe Flight did was that it changed and burdened the actual message that Safe Flight was trying to promote with its own advertising by requiring... It was a restriction, but still in the commercial speech context, it attempted to equalize access and, you know, the statute had come about because of complaints by other small business owners saying that these guys are dominating the field. That's kind of what's happening here, isn't it? I don't think so, Your Honor, because there's no countervailing message that disclosing customer data affects here. I think that that's the core distinction between this case and Safe Flight. And the other point I'd make is that, you know, I think that in a lot of these disclosure cases, the required disclosure is going to benefit competitors. So you look at the mercury light bulbs, NEMA case, that's going to benefit light bulb manufacturers that don't have mercury in their light bulbs. You look at the New York State Restaurants Association, the calorie disclosure case, that's going to benefit restaurants that don't have to comply with that requirement. So I think that... Of course, there's always going to be economic, you know, winners and losers with most any regulation. But, I mean, this, it seems that is the stated purpose, is economic favoritism. And so I guess I'm just going back to how is that something that benefits the public? Well, I think it benefits the consumer here, which I think we need to view as the restaurants, because restaurants are the ones that are the plaintiff's customers here in this framework. In their framework that they've developed this, so they deliver these orders and customers to restaurants. And so what this law does is it provides more information about that very transaction, about that economic relationship. And I think that that's the fundamental issue here in terms of why this falls under Zouderer. I think that, you know, plaintiffs are trying to make this into a case about economic assets and, you know, competitor status and competitor status. This framework doesn't belong in the First Amendment, really, what their actual complaint is. Their complaint is really a property or a contract type of claim, but that's... Well, on the Zouderer sort of inquiry, can you just explain, and I'm sort of having a hard time understanding, but if you can just explain as simply as possible how the disclosure required by the law is about the terms, services, goods of the plaintiffs? Sure. I think that's... So I think that number one, Zouderer, in our view, is not limited to the terms of a particular transaction. I think that the crux of Zouderer is that it has to be about the goods or services that are being offered by the disclosing party. And I think that that test is amply met here because of the relationship that we've described. I think that part of the inquiry here is whether restaurants are going to continue to have this economic relationship with the plaintiffs and whether they are going to have the autonomy and the choice to be able to remove themselves from this relationship if they want to set out and market to customers themselves. I think that if the court looks... Part of what DoorDash offers to a restaurant is a customer's phone number. Is that your argument? Part of what... It offers them customers. It offers them orders. So part of that... So the information about the phone number and their contact information is information about the goods and services that DoorDash and its colleagues are providing. So that, I think, is enough to establish that this is a Zouderer kind of case. Because I think that what's important to remember is that the First Amendment is about promoting the free and robust flow of commercial information in the commercial context. And I think that that's exactly what we have here because of the way that the plaintiffs have inserted themselves into the restaurant industry and just really distorted the marketplace here. And so restaurants need this information from a commercial perspective, and that's all Zouderer is about, whether this is commercial information, to be able to make decisions about their economic relationships. Does it matter for this inquiry or to your arguments at all that the information is personally done PII, personally done phone information? I don't think that it matters for... How does that affect the case? Because it seems, I mean, it's in the background and it seems unusual and different from all the other cases that I've read. Well, I think what's different here is that, number one, plaintiffs are peculiar representatives to be pressing privacy concerns of restaurant patrons, who I would just emphasize are not part of this case. None of them have brought a claim here in that regard. And given the amount of information that these plaintiffs collect and distribute on their own, I think that they can't really bring a privacy claim. But I think that the important thing to remember, too, is that anyone, any individual that has a privacy concern has the ability to opt out. I guess my question isn't, I mean, I understand your point, the business of selling this information, but it's the city's law that's requiring the disclosure of it. That's right, Your Honor, and I would just point to the fact that any restaurant patron that has a concern has the ability to opt out. So I think that that doesn't factor into the First Amendment analysis from the plaintiff's perspective, and I would just emphasize that this Court has repeatedly stated that the privacy concerns of plaintiffs are entitled to very little to minimal weight. Could I ask a question? If we end up in Central Hudson in that kind of analysis, what kind of evidence here is showing does the government need to make to show that substantial state interests are implicated, and what evidence have you offered to make that? Sure, so I think that's important to emphasize that no case requires empirical data to establish that this meets Central Hudson's test. I think that the Court can rely on anecdotes, the Court can rely on common sense, the Court can rely on the studies that are in the record. But you started out with the kind of COVID makes extenuating circumstances kind of rationale, so we're protecting the restaurant industry generally, but then that seems to have been left by the wayside, and now we're just protecting the restaurant industry generally. That's very easy to assert. I mean, what more can you give us to hold on to in assessing whether there is a substantial state interest and whether this is a means of protecting it? Well, I think that the record is replete with hearing testimony as well as the three reports that the City Council put together and the findings that they made in terms of the impact that the plaintiffs have had on the restaurant industry. And, you know, it began with COVID, but it has continued since COVID in terms of the shift to the app-based delivery system. And so as they've captured more and more of that market, the restaurants are placed in this bind in terms of having can't live with it, can't live without it. So we have testimony from restauranteurs, we have testimony from representatives of the New York City Hospitality Association, as well as the State Restaurant Association. And so I think that that on its own is enough based on the way that the plaintiffs have distorted the marketplace here in terms of establishing an interest for allowing restaurants to assert their own autonomy, to be able to make their own decisions in terms of whether to transact with plaintiffs without losing access to most important customers that plaintiffs have gathered significant evidence, significant data about and are poised to use that data if they leave these platforms. I think that's all well established in the record based on the hearing testimony as well as the report. And one more clarification. Am I right in understanding that the restaurants already receive much of this information in connection with individual orders, but they're just not permitted to use it? Absolutely, Your Honor. So I think that maybe last name they might not get. I think it's typically first name and last initial, as well as the order contacts. And if they're going to be using their own delivery, they would get the information to be able to make that delivery. But the fundamental point is that once the order is completed, these restaurants can't use that information for additional marketing purposes. They can't use that information to reach out to and foment... So the use restriction is kind of an odd aspect to challenge in the context of the First Amendment, I suppose. I think that's right. I think that goes into why this should pass First Amendment scrutiny, Your Honor, because what we're really talking about here are an economic asset that the plaintiffs are trying to protect. And so that's not really what the First Amendment is about. I think that the First Amendment is about, in the commercial context, is about promoting access to information. If they want to bring an economic argument in terms of a takings claim or something like that, they can do so and they have done so, but that's not the First Amendment. So again, the district court just didn't rule on that, having ruled that it failed the First Amendment test. That's right, Your Honor. The district court decided that those issues were moved. Thank you. I just have one more question. Is there evidence in the record that the city considered other alternatives? The plaintiffs mentioned some possibilities, consumer opt-in requirements, financial incentives to encourage sharing this info, things like that. So I think that what happened is that the city made concessions to the plaintiffs' industry in terms of what this law was going to require. I don't think there was an opt-out originally. And so the city council determined that they were going to provide an opt-out for restaurant patrons to be able to refuse to disclose this information to restaurants. And that also demonstrates how this is not a privacy issue and that how this is narrowly tailored or you don't even need to show narrow tailing, but that it's reasonably related to the harms that... The record is really big and I'm just wondering, is there a place I can look to to see that the city considered other iterations of this law, different requirements that it didn't? Yes, I think that we talk in our papers about the first version of the customer data law and how it was a bit broader than what we have now. Okay, so just the previous iteration of this law? That's right. All right, you've reserved some time for rebuttal. Thank you. May it please the court, Michael Holacek for the plaintiffs. The district court was correct that this is not a Zouder case. It doesn't require any type of disclosure to consumers. It's not aimed at preventing any type of deception or misleading conduct. It's not information about the terms under which we offer our products and services. And there's never been a Zouder case that goes beyond that court. This case is governed by safe flight. And I will say, I think that the law here is more problematic than safe flight. Counsel said that in safe flight, it was partially a restriction and partially compelled speech, which meant that in safe flight, the company could avoid that speech if it didn't want to help its competitors by giving information away to help its competitors. It didn't have to promote its own product on those phone calls. Are you a competitor? Are your clients competitors of the restaurants? There are competitive aspects. We're contracting partners. And in some respects, there's a partnership and we're both trying to get more consumers to the platform. But this is one area where there is competition. Some restaurants would rather market to a customer themselves and have that customer order directly through them. And this law would exacerbate that. It makes it almost like a zero-sum game. But you are being asked just to disclose factual information that is already partially disclosed to the restaurants, some of which the restaurants already have, probably, in any event. And you are not, you don't do any cooking as far as I know. We don't. I mean, I will say, though, that, and this goes to a question about the PII aspect of this. Even though it is factual information, First Amendment still covers that. That's the IMS, the Sorel case that in fact prescribes our information. But here, we also have the layer of this being personal data. But the restaurants already get a lot of the information. They have continuing relationships with some of these customers. That's not the kind of personal information that we typically are called on to protect. And you are gathering it. In fact, you're selling it in other circumstances. So it's a little odd to hear you purport to represent consumers complaining about the disclosure of their personal information. But, Your Honor, this is what's really important. To no other restaurant do we give or sell these five categories of data. And in the very limited circumstances when we have a contract with a large chain and we give them some of those five pieces of data, it's opt-in. So we make the customer affirmatively say, yes, share my information with that company. So would you be okay if the law were amended to provide an opt-in as opposed to opt-out? It would be a tougher case for us. That burdens far less speech than this would. And it's something that the city did not consider. It could still be susceptible to a First Amendment challenge, but it's at least more narrowly tailored than this law. And what is the expressive content of this speech? The addresses and personal information of the people themselves. That's your expressive content, though? Yes. It's information that has been trusted to us by our customers that no consumer has said it's okay to pass that along. What does it express? What views does it express? It doesn't express a view. It's information about them, where they live, what they've ordered. So we're really talking about commercial, factual, non-controversial, non-misleading, non-deceptive, factual information, right? I agree with most, except for the non-controversial. This court doesn't have to decide whether this is purely commercial speech or there's an element of non-commercial speech to it. That would be the bad frog test. I think there are elements of non-commercial speech here. We're not using this to propose a commercial transaction. So it definitely falls outside of core commercial speech. It doesn't help us to give this away. But it is of economic value. This is an economic fight, not really anything else, as far as I can see. It is, but this court has held almost anything that is said, you could say, has some commercial value to someone, even financial journalism. It can be accurate. It's meant to benefit the writer or the publisher, but it has some non-commercial elements to it as well. So if we are in central Hudsonland and not a rational basis in Zottler, hasn't the city shown that there's a substantial interest? The restaurant industry is important to the city and many, many small businesses, as well as large marquee restaurants. It's really essential to the city's identity. Isn't that enough to give the city a substantial interest in protecting those relationships? No, under Safe Flight, I believe that that that is not enough under central Hudson to burden speech. And when you go at that high level of generality, the goal is to help the restaurant industry. Now we have a lot of other tools at our table that don't burden any speech. There are subsidies. There are PR campaigns from the city. There are tax breaks. All of these things that burden no speech at all could presumably help the restaurant industry. And to yonder's question of whether there's anything in the record on this, there's not. There's no evidence they considered anything else other than, I agree, a more a broader law that would burden even more speech. And the cases keep telling us that the city, the government has to look at what other possible options are on the table that would burden less speech. So I'm still having trouble understanding why an opt-in or a different opt-in, opt-out regime wouldn't satisfy the concerns you're expressing now. I think it may. Well, I think it may satisfy the city's goal. If the city's goal is to connect restaurants with willing customers who want to reorder from that restaurant, an opt-in would seem to achieve that. I mean, these are the people who raise their hand and say, yes, connect me to that restaurant. Those are the people who would be most likely to want to order directly from the restaurant. It would burden less speech because we'd only be transmitting the opt-in information, not just anyone who ordered. And sitting here today, I don't know whether that would have been as effective as the law be passed. But I think the point is they never consider it and they never talk to restaurants. Would it be better to have a smaller list of the people who actually said, please contact me, I want a relationship with the restaurant, as opposed to just this big list of just anyone who ordered. And that's something they didn't consider. And I think the district court was right that there's just not a strong fit between the law and the objective here. If you look at the record, the objective stated over and over and over again was to, you know, quote unquote, balance a playing field and help the restaurants. You agree though that if we are in central Hudson, the city doesn't have to show that it's using the least restrictive means available, right? Correct. The magic words that are repeatedly used are, you know, it doesn't burden substantially more speech than necessary. So it doesn't have the exact perfect fit, but it shouldn't, you know, burden substantially more speech than necessary. But of course, since we're not really talking about expressive speech here, the city has more leeway, doesn't it? It has more leeway than maybe strict scrutiny, but still there, still these tests are not toothless. And there have been many cases that have rejected similar laws under central Hudson because just the fit wasn't good enough. And I want to address... Can I go back before you move on? Can I go back to Judge Carney's question about the substantial government interest and the city's stated interest is protecting the restaurant industry, I think, just generally. And I'm not sure that that kind of economic favoritism is foreclosed by Safe Flight. I mean, Safe Flight said that they were skeptical, the court was skeptical because of that sort of protectionist, economic protectionist motivation, but that wasn't, I think, it moved on then to talk about the impact and the second prong or the third prong, I guess, of the analysis. I mean, if Safe Flight did not hold that directly, I think this court should. I mean, I think Safe Flight strongly points in that direction and would be very concerned about a rule that says as long as the government can say it's helping or protecting a certain segment, then it can compel competitors to speak. I mean, you can imagine all the different industries, travel industry, real estate brokerage with Zillow and Redfin. And governments do that all the time. They can regulate them, but they don't compel speech. Never seen a law where the government says, you know, this particular industry needs some help. We want to protect them. Here's another group of companies that has information that would help them. We're going to force them to give that information. But unlike in Safe Flight, though, the state of Connecticut didn't have an inherent interest in supporting small repair shops. Here, the state plausibly alleges and has produced some data suggesting that as a city, as a political entity, it has a very important interest, both from tourism perspective and for serving its residents, to have an easy and effective way of allowing people to order, but also supporting the restaurant industry, both small mom-and-pop organizations and large ones itself. So it has an independent interest that was absent in Safe Flight. Or am I missing something? No, I don't think you are. But I do think that Safe Flight is essentially about helping small businesses. And maybe it wasn't framed exactly in the same terms as it was here. But we also have to remember that this generated out of, you know, this came about during the COVID era of trying to help restaurants then. And if this were a temporary bill, something that lasts until restaurants reopen or something, it might be a harder case for us because then you've got a better fit between what the law is requiring and what that objective is. But a perpetual law that goes out forever, that, you know, we want to help these small businesses and large businesses, as was pointed out, it's not very well if the point is to help, you know, the fabric of the city and these small restaurants, it's not well tailored to that as well because it forces us to give information to big chains where we otherwise negotiate for the rights over this data. But it has sounded like you sell to a very few large chains, but generally you tightly control the data. I mean, the whole model of food delivery has been changing as your apps have increased in their effectiveness and in their familiarity to people. And so we're in a different world than we were at the beginning of COVID. I hear that, but I want to make sure the court understands that it's not involuntary to join our services. That's how counsel started, that it's almost a requirement that they use them. And I want to include there are three options for restaurants. One is not join the platforms. Two is join our marketplace, which is the product we're mostly talking about. But the third, and this gets, I don't want to get lost in the record, all plaintiffs offer another product that lets use our ordering technology and delivery drivers, and they keep all of their own data. Has that third option been available since the beginning of this lawsuit? It has. I guess I should say since the very beginning when the law was passed. It has. And remarkably, it's mentioned a single time in one footnote in one of the city reports where the city just says, by the way, the plaintiffs also offer these products. No analysis. Is it possible that the commissions charged vary so significantly between models? And I know that there's information that's under seal here, so I won't pursue that in detail, but that essentially smaller businesses, smaller restaurants are forced to use one model over the others. And so they're not as available as they would be. Understood. With this particular product I'm talking about, there are no commissions. Restaurants only pay a delivery fee if they want help with the delivery. So the idea is that restaurants are shut out of the delivery market is just untrue. They can pay for delivery. Or if they just want to use our ordering technology, that is only a processing fee. I think it's about $3 per order. So the issue is not, I mean, I'm not asking the court to weigh all these options and see whether those products are sufficient in what the city was trying to do. The issue here is that the city never considered that and didn't talk to restaurants and didn't ask the people who testified. If restaurants want their own data, why aren't they using these other products? Over 2,000 restaurants in the city use these other products. They own all of their own data. There's no restrictions how they can use the data. They can market as much as they want to those customers, but the city council just didn't consider it. So I'm wondering if you could answer a procedural question for me, which is that you brought a takings claim as well as a First Amendment claim. And because I'm having such difficulty seeing expressive content in the data that we've been discussing this morning, I kind of wonder how the court ended up treating the First Amendment issue before the takings claim. Is there a procedural reason for that? I don't believe so. We briefed all of them on summary judgment. We have a takings claim, a contract claim, and a First Amendment claim. And the district court decided to resolve the First Amendment claim and so didn't address the takings or contract. I don't know why. I will say, though, I want to make sure I'm clear that even though this is non-expressive speech, it's still protected by the First Amendment. And that's not only safe light, it's international dairy where we're talking about... But it would just receive a much lower level of protection. But at least heightened protection, at least intermediate scrutiny. And that's the international dairy case about growth hormones used on cows. That's the United Foods... Why is international dairy on points? That was actually a substantive communication about the nature of the product. But it was just accurate, dry information that was not expressive. And that received First Amendment protection as well. But what we're talking about here isn't really about the nature of the product. I agree, which is why we're definitely out of Zouder land. Because this is not a disclosure about the terms of our product. It doesn't help restaurants understand the product better. So we're definitely out of Zouder. I understand that argument, but I think I share Mr. Carney's concern. This is sort of a weird fit for the First Amendment when the information that's being compelled to be provided is kind of more akin to customer business data that somebody collects and not what we think of as... That's the Sorrell case. That was dry, factual, prescriber information. And the state made the argument there that when you're talking about dry data, that that's not protected by the First Amendment. And both this court and then the that no, even if it's dry, factual data, it's still protected by the First Amendment. You agree on the substantial interest. We may disagree about whether the city has shown a substantial interest, but you agree that they don't have to show that this is the least restrictive means. Not least restrictive. I think the magic words are, doesn't burden substantially more speech than necessary. So that would be the standard we would say the court should apply. Thank you. Thank you. Thank you, counsel. We'll hear about them. Thank you, your honors. I think that first I would just point the court to the record at A919, which is an email discussion with regard to the opt-in versus opt-out that took place between a city council representative as well as some of the industry representatives in terms of other alternatives in terms of the opt-in opt-out. And I think that the emails show that they were strongly in favor of the opt-out requirement. But more to the point, I think, what plaintiffs are doing here is are trying to protect what they perceive as an economic asset. And I think that they're trying to shoehorn that concern into a First Amendment claim, but that's not what the First Amendment is for, particularly in the commercial context. The First Amendment is about promoting access to information, about ensuring the robust and free flow of commercial information. And that's exactly what this law does. And I think that to the point about the FIT issue, either under Zouderer or with regard to intermediate scrutiny, I think that the city identified a specific harm, which was lack of access to data, which was hamstringing restaurants' ability to make their own decisions in terms of how to structure their business in the face of these overwhelming market concerns. And the city council addressed it directly by requiring the disclosure of the data that the plaintiffs were withholding. Now, under either Zouderer or intermediate scrutiny, the city wasn't required to take a more circuitous means to achieve the direct result that they were seeking. They identified a problem, and they went after it directly. All of these things about whether, oh, it should have been opt-in, or it should have been incentives through tax structures or something like that, all of that would reduce unless data being shared. And that was the fundamental concern that the city council was confronting. And so there is no FIT problem under either Zouderer or intermediate scrutiny. I think that what was important- What about your opponent's point that there are different programs available from their clients, and some of them provide all this information? So I think that the issue here is that this still leaves customer data in the hands of the plaintiffs. And this leaves information about these critical customers subject to marketing from plaintiffs in terms of marketing competitors that still remain on those platforms. But 2,000 restaurants, if we use your opponent's figure, have already chosen to have that, gather that information themselves, and it's made available to them. Why is that? How does that measure up to the argument you're making that you'd compel them to share that? Well, I think that's fine that they can make that choice, that these restaurants can make that choice to utilize the other's tools, but I think that- Well, the fact is that they provide a service to the industry, and so therefore, they gather this information during the conduct of the service. So why is it that if that information is made available by them, and so a restaurant has the opportunity to enter out of that service, why is it then the city council's place to then order them to divulge it to everyone, even those that choose not to have that kind of service when it's provided to them by the various platforms? Well, I think that it goes to the nature of- Doesn't that seem kind of like overkill to you? I'm sorry? Doesn't that seem like overkill to you? Well, no, your honor. I think that it goes to the nature of what the plaintiff's role in this market is now. I think that the marketplace offerings that they have has all of the restaurants that a customer may want, generally, and so they are able to go, they can look for a Mexican restaurant, and so- What did the city council do to measure the need of this? Is there data in the record that reflects that the restaurant industry generally was calling for the sharing of this data? Well, I think that, number one, we don't need empirical data. I think that that's clear from New York State Restaurant Association, as well as Lorillard, under either intermediate scrutiny or under Zouderer, but I think that what's very clear from the record is representatives from the restaurant industries, the New York City Hospitality Alliance, as well as the New York State Restaurant Association, individual restaurateurs testified to the need for this data as well, and I think that from that, we can- I think the city council rightly determined that lacking this access to this data was critical and was really hamstringing the ability of these restaurants to make their own financial decisions, your honor, in terms of transacting with plaintiffs. All right. Thank you, counsel. Thank you both. We'll take the case under advice. Thank you, your honor. Next argument will be in case number 25188, United States versus Delaware. Mr. Rosenberg, may I be ready? Your honors, may it please the court. Jonathan Rosenberg for Mr. Delahose, the appellant in this case, and at the outset, I want to remark that the district court in this case, the remarks at this sentencing proceeding, I think were moving. I think they were precisely the kind of frustration a person not in the position of a judge should feel about a delinquent defendant continuing to violate conditions of supervised release over the years. This was a very challenging case for any judge to deal with, but the judge was right on all the human instincts. He was wrong on the law, and that is why we were asking this court to reverse and remand, and even if the court reversed and remanded, and it went back and it gave the same 60 months, but on a proper process without the references that are made to the original sentence and the desire for retribution as prohibited by this court now, and also Hysteris, if I'm proceeding, where the violations were not the focus of the sentence in this case. I'd like to just read four very important quotes from the transcript of sentencing and draw this court's attention to them specifically from the record. Let me just interrupt for a second. I'd appreciate it as you go through the transcript that you would differentiate between what you see as improper retributive comments regarding the underlying offense versus regarding the violation of supervised release. That's critically important, and I'll do that, Your Honor. Thank you. As to referring first to the original offense, the court began with the offense, not the violation, and I quote from Appendix A-129, the court began, and this is the quote, this is a case unlike any I've encountered in 20 years, and that it's a person who received a significant break. Now, we know from Kerr and we know from Lopez cases decided by this court that a court can refer to the past. A court can refer to delinquency. A court can do that. And it goes further. He talks to the probation officer. Probation recommended 24 months, and they had a very meaningful colloquy with the court. Probation tried to discuss the difficulty of the position of trying to weigh the needs of supervision with the needs of violations. It was an interesting colloquy to read, and, quote, we have A-122 of the Appendix 122, quote, and the probation officer in that colloquy, well, I mean, he was looking at a 27-year sentence, and that's referring to the original offense. And I'll start again. Well, I mean, he was looking at a 27-year sentence, mandatory, on the charges that he was originally charged with and pled guilty to, right? And that's also referring to the original offense conduct. This is not like Lopez. This is not like Kerr. We then just get... But you agreed that the court is entitled to look back and review what has happened. That doesn't necessarily establish that in imposing a sentence, he is not focusing on the violation. That's absolutely correct. The court can do that. It's understandable if a court does that. And I know this court is very familiar with the transcript. You can see if that's what's being done or not, and I would draw to A-130. Do you disagree that the court can be assigning retribution for the violation of supervised release? I apologize. Can they assign retribution? Retribution can be a motivation for the violation of supervised release, but not the underlying offense. Is that right? You don't disagree with that, do you? No. Or do you think Asteris prohibits retribution, consideration of retribution as a factor in anything? My reading of Asteris is it focused on the underlying offense as to retribution, not as to... Wait, that's the question. The question is, can the court consider retribution with regard to the acts that constituted the violation of supervised release? I think in some part they can, based on the statutory. Yes, the statute does not eliminate that completely. So the district court talked about breach of trust and the significance of the breach of trust here. Significantly. And wouldn't it be reasonable to think that the degree of the breach of trust has to do with, there is influenced in part by what happened previously in the original sentencing? And that certainly can be the case, but that is not what happened here. We have even just the reference at A-130, five years is the most I can give you. I candidly think you deserve, deserve is the key word, much more than that, much more than that at A-130. And that was not just referring to the violations. That's the language of punishment referring to the history of lying and deserve more for the criminal history that began in 2015. If we read... There was, there was, you know, I've only been doing this 39 years, but I've never seen a case where someone went out of their way to manufacture an excuse with regard to his conduct, with regard to the Philadelphia incident. I mean, he falsified, falsified documents. He got other people to lie for him. He, this thing about a food truck. I mean, this, this shows an utter disregard, a total attempt to avoid responsibility. And I, I think the district court judge was noting that, wasn't he? I mean, in all your time, have you, have you ever had a client who had the, had the audacity to go in and lie to a federal judge about, well, this was really going to be a visit, a food truck. The only reason he's got caught was because his phone was tapped. Yeah. I think what's the key is though, we have the... Incredulous is the word that comes to mind. What was the word your honor? Incredulous. I mean, I've never seen anything like this. Right. And I think that's, that's the, the issue though. He played the four violations though, and he wasn't charged and the government, the judge is very clear with the prosecutor. I want you to charge. I want to, why are you prosecuting these crimes as crimes? Why aren't you going forward? Because this deserves more time. But that's all about the violations, not about the underlying offense. Right. And that does have to do with the violations. It shows what the thinking is as to the entire proceeding. There's no way Mr. Delahose could have walked into that proceeding and gotten anything less than 60 months or a fair hearing on the probation's view or anything like that. Because the judge's first remarks before even there were argument from defense counsel were about, well... This is all plain error here too, right? Plain error. Correct. It's clear and obvious. But other quote, given that break you got the first time, it seems to me that you are still coming out way ahead. Way ahead means what you should have gotten. Way ahead of where you should be given your conduct. A judge can express that regret on the original sentencing all they want if they're not actually acting on that. There was no weighing of any factors having to do with what actually happened as to the pled to violations. It was uncharged conduct. We don't have proof of it. We don't have proof of, I mean, the judge didn't have the ability to have a hearing on the things that were not what he pled to. He pled to four violations involving a car chase. And it is incredulous, even just the car chase conduct, Your Honor. But incredulous doesn't equal a predetermined 60 months. And it was more than just temperament. It was a... It felt personal if you read this. The judge felt like it was a personal violation of trust. And that's permissible to the degree it's not personalized. Well, there are cases that have called the breach of trust aspect in the violation of supervisor's release where they called the judge the victim. That is the breach of trust in the sense where you set conditions and said, okay, we're looking forward. We're going to let you rehabilitate. We're going to do our best to support you. And then you went out and did something as outrageous as this. And...